ALDRICH CHEMICAL COMPANY, INC., PLAINTIFF v. UNITED STATES, DEFENDANT

Court No. 78–6–01082

Before WATSON, *Judge.*

(Decided November 9, 1981)

*Foley & Lardner* (*Bernard E. Edelstein* and *Jon P. Christiansen* at the trial and on the briefs) for the plaintiff.

*J. Paul McGrath,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office Commercial Litigation Branch (*Saul Davis* at the trial and on the brief) for the defendant.

WATSON, *Judge:* In this test case the Court is faced with a dispute regarding classification of 13 entries of an organic chemical compound named Cytochalasin B, which were imported imported during the years 1977, 1978 and 1979. The compound was classified under the

---

[2] See the following table:

| Entry No. | Date of entry | Date of liquidation |
|---|---|---|
| 493994 | 7/27/77 | 8/26/77 |
| 525764 | 8/19/77 | 9/16/77 |
| 529941 | 8/24/77 | 9/16/77 |

provision for other nitrogenous compounds of Item 425.52 of the Tariff Schedules of the United States (TSUS) and assessed with duty at the rate of 1.5¢ per lb. plus 7.5 percent ad valorem. The plaintiff claims that the proper classification should be as other natural alkaloids and their compounds not artificially mixed under Item 437.22, dutiable at the rate of 2 percent ad valorem.

There is no dispute that this compound is nitrogenous. However, because alkaloids are one of many groups of nitrogenous compounds, classification as an alkaloid, if proven, would be more specific. Attention must therefore be focused on the question of whether Cytochalasin B is an alkaloid. On this question the parties offered conflicting expert testimony and a plethora of scientific treatises.[1]

The Court found the expert testimony and evidence offered by plaintiff to be the more impressive. This included the testimony of Dr. James Cook, a professor of Chemistry at the University of Wisconsin and a specialist in alkaloidal chemistry, and Dr. Alfred Bader, president of plaintiff and a distinguished chemist with long experience in the sale of chemicals.

From the testimony and evidence, the Court finds that Cytochalasin B is a metabolite of a fungus, that is to say, it is a product of the normal metabolic functioning of a fungus. Its name is a compound of the Greek words for "cell" and "relaxation," a reference to its ability to inhibit the normal division of cells. As a consequence, it is used in cytological research, in the study of genetics or biological processes.

To obtain Cytochalasin B the fungus is grown on a medium and then extracted with chloroform. The extract is subjected to silica gel chromatography which, by a process of selective adsorbtion in a column, yields first Cytochalasin A, then A mixed with B. Cytochalasin B is separated off and crystallized. In structure it has several rings, one of which is a heterocyclic ring containing a nitrogen atom bonded to a carbonyl.

Plaintiff's argument was threefold: First, it argued that the best modern authority includes Cytochalasin B among the alkaloids. Second, it argued that even the "classical" definition of alkaloids adopted by the government would properly include Cytochalasin B. Third, it argued that the proliferation of discoveries in the field of alkaloidal chemistry required a new and more accurate definition

[1] In connection with an issue discussed at footnote 6, the Court reserved decision on the admission of Defendant's exhibits F and G for identification and now excludes the former and admits the latter. Exhibit F for identification is a copy of an article from a publication entitled "Carolina Tips" and is copyright by the Carolina Biological Supply Company. It does not have the appearance of a standard or authoritative source. Exhibit G shows itself to be from a standard reference work entitled *Dictionary of The Fungi* by G.C. Ainsworth (Commonwealth Mycological Institute, Kew, Surrey 1971) and can be accepted as such. In the use of reference works in the determination of the meaning of tariff terms the Court continues to rely on authoritative publications introduced in evidence, appended to briefs or located in its own researches. See *Schott Optical Glass, Inc.* v. *United States*, 67 CCPA, 32 C.A.D. 1239, 612 F. 2d 1283, 1285 (1973); *Trans-Atlantic Co.* v. *United States*, 60 CCPA 100, 471 F. 2d 1397 (1973).

of the term "alkaloid." It offered such a definition, under which Cytochalasin B would undoubtedly be an alkaloid.

Defendant responded to these arguments by citing what it considered to be contrary authority on the scientific recognition of Cytochalasin B as an alkaloid, by arguing that Cytochalasin B departed from the classical definition in a number of respects, and by offering criticisms of plaintiff's new definition.

On plaintiff's first point it stressed the discussion of Cytochalasin B in the section on miscellaneous alkaloids in *Specialist Periodical Reports, The Alkaloids,* Vol. 6 [Exhibit 23] and the inclusion of other Cytochalasin compounds in Vols. 5 and 7 [Exhibits 21 and 22]. It characterized the *Specialist Periodical Reports,* published by the Chemical Society of London, as the most up-to-date and comprehensive work on the subject of alkaloids, a characterization which was not effectively challenged.

Defendant countered with the inclusion of phomin (another name for Cytochalasin B) in a chapter on non-alkaloidal nitrogen compounds in Nakanishi, *Natural Products Chemistry,* Vol. 2 (1975) [Exhibit A]. Defendant also sought to lessen the authority of the *Specialist Periodical Reports* by arguing that it lists many compounds which assertedly are not alkaloids such as penicillin, and maytansine.

However, when the Court considers that Nakanishi is a general work on natural compounds, only a portion of which is devoted to alkaloids, and further, that Nakanishi refers readers to *Specialist Periodical Reports* for additional information on alkaloids, the primacy of the latter is sufficiently established. Furthermore, the inclusion of compounds such as penicillin in *Specialist Periodical Reports* does not discredit it. While it may be better known as an antibiotic, from a structural standpoint, penicillin and certain other antibiotics can be properly placed in the family of alkaloids.

The weight of plaintiff's evidence was not diminished by proof that Cytochalasin B was not listed in other publications such as Glasby, *Encyclopedia of the Alkaloids* [2] (Vols. I–III, 1975–1977) and Manske, *The Alkaloids.* First, considering the magnitude of the field, the absence of a listing does not permit the inference that the author had considered the question and second, the authors acknowledge the inevitability of omissions in a work covering a field as large as that of alkaloidal chemistry. In addition, Manske was proven to be somewhat dated.

Finally, on this first point, defendant's proof that the cytochalasins are also referred to in scientific literature as microbial or active

---

[2] Defendant's argument that Professor Glasby must have known of Cytochalasin B (because he worked for the company that discovered it) and therefore must be presumed to have considered and decided against its treatment as an alkaloid is rejected as highly speculative.

metabolites,[3] mold metabolites [4] of fungal metabolites [5] is not inconsistent with proper denomination as an alkaloid. It cannot be expected that writers in a field in which there are acceptable alternative ways to describe a given compound will use a single term and it is certainly understandable that they may wish to use a term which emphasizes the source or function of the compound rather than its membership in a general class of chemical compounds.

In sum then, as regards usage in the scientific community, the Court is satisfied that Cytochalasin B is considered an alkaloid.

On the second point of conformity to the traditional definition of alkaloids the Court agrees with plaintiff. The Court finds that even assuming the correctness of the definition of alkaloids advocated by the defendant, it would not exclude Cytochalasin B.

The traditional definition appears with varying degrees of reservation in a number of texts. A good example is the definition given in G.A. Swan, *An Introduction to the Alkaloids*, (1967) p. 1 [Exhibit 24].

It is not easy to give an exact definition of what is meant by an alkaloid. In a broad sense, alkaloids are nitrogenous bases which occur naturally in plants. They nearly always contain their nitrogen as a part of a heterocyclic system and are often quite complex in structure. A particular alkaloid is usually restricted to certain genera and families of the plant kingdom, rarely being present in large groups of plants. In addition, the alkaloids usually show specific pharmacological activity. However there is no very sharp distinction between alkaloids and many other naturally occurring nitrogenous compounds. For example, colchicine is regarded as an alkaloid because, although it is not heterocyclic and is scarcely basic (it is, in fact, an amide), it is active pharmacologically and is of restricted botanical distribution. On the other hand, Thiamine, although is it a heterocyclic, nitrogenous base, is not classed as an alkaloid because it is universally distributed in living matter. Biosynthetically, the alkaloids are related to the amino acids.

The defendant's version of the traditional definition requires that a compound be of plant origin, nitrogenous, basic, heterocyclic and of complex structure [Exhibits 20, 24, 25 and A]. In the Court's opinion, plaintiff has proved that Cytochalasin conforms to this definition in all but one respect [6] and in that respect it is in the company of numer-

---

[3] Binder and Tamm, *The Cytochalasans* [sic]: *A New Class of Biologically Active Micrboial Metabolites* [Exhibit E].

[4] *The Merck Index* (9th Ed.) p. 365.

[5] 83 Chem. Abstracts 23529, No. 23504V.

[6] Defendant's argument that fungi are not plants is rejected. Although there admittedly is a divergence of views regarding whether fungi are part of the plant kingdom, the more widespread view is that they are plants. On this point the Court is also influenced by the acknowledged acceptance as an alkaloid, of ergota· mine, notwithstanding the fact that it is derived from a fungus. Moreover, when it is considered that the ergot alkoloids are among the oldest recognized alkoloids, the making of a distinction in this area between higher and lower plants seems artificial.

ous non-basic alkaloids. Before tiring, plaintiff's expert witness was able to find 162 nonbasic compounds treated as alkaloids by Professor Glasby. The Court was additionally persuaded by the fact that Colchicine, which is also used for cytological research, is a recognized alkaloid despite the fact that it is neither basic nor heterocyclic. In the same vein, Professor Glasby recognizes Maytansine, which is derived from a fungus and is not basic.

On the issue of definition the Court found the testimony of plaintiff's witness Dr. Cook to be the more persuasive.

Defendant's expert witness was Dr. Edwin Vedejs, also a professor of chemistry at the University of Wisconsin. At the trial, the Court reserved its decision on declaring Dr. Vedejs to be an expert witness. It did so due to some reservations it had on the extent of his work with alkaloids and on the fact that his familiarity with Cytochalasin B was limited to unsuccessful attempts to synthesize it. Upon reflection, the Court accepts his expertise in this area although it is inclined to give greater weight to the opinion of one whose experience is more completely devoted to the field of alkaloids.

In addition, the impact of Dr. Vedejs' testimony was somewhat lessened by his unfamiliarity with Professor Glasby's reference work on alkaloids, his disagreement with defendant's position that an alkaloid must be heterocyclic and his refusal to recognize such accepted alkaloids as caffeine or theobromine. Furthermore, he sought to distinguish Cytochalasin B from other alkaloids derived from Phenylalanine by stating that all the others lost their carbon dioxide molecule in the process. However this is evidently not true of Cyclopenin and Cyclopenol, both of which retain carbon dioxide during biosynthesis from Phenylalanine.[7] Finally, and more generally, the Court found inconsistency in his overall acknowledgment of imprecision in the traditional definition of alkaloids and his attempt to foster a strict standard for excluding Cytochalasin B.

In the final analysis, the Court did not try to arrive at a new and more accurate definition of alkaloids, although plaintiff's proposed definition did appear to be more satisfactory.[8] This was not necessary

---

[7] See p. 15, Vol. I, *The Alkaloids, Specialist Periodical Reports* (1971) and L. Nover and M. Luckner, *On the Biosynthesis of Cyclopenin and Cyclopenol, Benzoliazepine Alkaloids from Penicillium Cyclopium Westling*, 10 European Journal of Biochemistry 268, 270 (1969) attached respectively as Appendice I and J to Plaintiff's reply brief.

[8] Dr. Cook eliminated the basic and heterocyclic requirements. He focused instead on alkaloids being nitrogenous substances which are secondary metabolites produced in plants. The nitrogen atom may be incorporated into the alkaloid molecule as an amine (weakly basic) an amide (neutral properties), as a non-basic N-Oxide group, or a basic quaternary ammonium salt. Finally, his definition states that many alkaloids demonstrate intense biological or pharmacological activity.

in light of its conclusion that Cytochalasin B is an alkaloid within the traditional definition. Nor is the Court of the opinion that it ought to undertake to define so specialized a term in a manner which has not yet gained acceptance in the field, even though the traditional definition is losing its value. At least it should not do so unless there is no other way to arrive at a decision.

Defendant made a final argument that the importation was not shown to be a natural substance within the meaning of the claimed classification and the definition in Schedule 4, Part 3, Headnote 3(a), which defines natural substances as substances found in nature and which have not had changes made in their molecular structure. However, it is the Court's view that the plaintiff's expert testimony clearly demonstrated that Cytochalasin B was a natural product of the fungus. Furthermore, Dr. Cook testified that Cytochalasin B had not been synthesized.[9] Dr. Vedejs testified that he had not been able to complete a synthesis.

Defendant also stressed the use of a synthetic medium on which to grow the fungus. This has no more bearing on the naturalness of the Cytochalasin B than a synthetic diet for cows would have on the naturalness of their milk. The use of radioactively labelled Phenylalanine by Binder and Tamm in their successful effort to discover how the fungus produced Cytochalasin B does not mean that radiocative Phenylalanine is needed for the normal production. The actual method extracting Cytochalasin B is set out in D. Aldridge, et al., "The Structures of Cytochalasins A and B," Journal Chem. Soc. (c) 1667–76 (1967) attached as Appendix K to plaintiff's reply brief. No radioactive Phenylalanine is used in the extraction and further, the Court is satisfied that whatever Phenylalanine is present in the fungus at intermediate stages is present naturally.

In this case plaintiff proved that Cytochalasin B was an unmodified natural product and the burden thereafter fell on the government to prove otherwise.

For the above reasons, based on its evaluation of the evidence and the expert testimony, the Court finds that Cytochalasin B is a natural alkaloid and should be classified as such.

Judgment will enter accordingly.

---

[9] This is the Court's understanding of his testimony as recorded at page 56 of the transcript:

Q. Do you know if Cytochalasin B has ever been derived by synthesis?

A. It has been. Cytochalasin C was synthesized by Stork. I don't believe it has been . . . I haven't seen the paper in the last year . . . if "B" has been synthesized.

The government seized on the first part of the response, which distorts the true meaning of the answer.